# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDE JERRY FLOOD, | ) Case No. EDCV 17-0862-JPR |
| Plaintiff, | ) |
| | ) **MEMORANDUM DECISION AND ORDER** |
| v. | ) **REVERSING COMMISSIONER** |
| | ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## I. PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed February 27, 2018, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is reversed and this action is remanded for further proceedings.

## II. BACKGROUND

Plaintiff was born in 1961. (Administrative Record ("AR") 20, 33, 197.) He completed 11th grade (AR 50, 201, 207) and worked as a pool-service man and groundskeeper (AR 19, 201, 207).

On June 18, 2013, Plaintiff applied for SSI, alleging that he had been unable to work since December 30, 2008, because of nerve damage in his right shoulder, carpal-tunnel syndrome, and complications from an injury to his right elbow and subsequent surgery. (AR 170.) His applications were denied initially and on reconsideration (see AR 73-84, 86-96), and he requested a hearing before an Administrative Law Judge (AR 117). A hearing was held on August 12, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (AR 30-72.) In a written decision issued December 11, 2015, the ALJ found Plaintiff not disabled. (AR 12-21.) Plaintiff sought Appeals Council review (AR 8), which was denied on March 14, 2017 (AR 1-6). This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance.

Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of

impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, he is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v);

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

<u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

    B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 18, 2013, the application date. (AR 14.) At step two, she concluded that Plaintiff had severe impairments of "degenerative disc disease of the cervical spine and lumbar spine; right shoulder and right elbow disorder; and carpal tunnel syndrome of the bilateral wrists." (<u>Id.</u>) At step three, she determined that Plaintiff's impairments did not meet or equal a listing. (AR 15.) At step four, the ALJ found that Plaintiff had the RFC to perform a limited range of medium work:

> [Plaintiff] can lift and carry 50 pounds occasionally and 25 pounds frequently; sit, stand, and walk for six hours out of an eight-hour workday. He is limited to frequent use of right hand controls for pushing and pulling and frequent bilateral handling and fingering. He can frequently climb stairs and ramps, balance, stoop, kneel, crouch and crawl; and occasionally climb ladders, ropes, or scaffolds. He can have occasional exposure to unprotected heights, moving mechanical parts, extreme cold, and vibrations.

(<u>Id.</u>) Based in part on the VE's testimony, the ALJ concluded that Plaintiff was able to perform his past relevant work as a groundskeeper and swimming-pool servicer "as generally performed in the regional and national economy, but not as actually performed by [him]." (AR 19.) Alternatively, at step five, the ALJ found that given Plaintiff's age, education, work experience,

and RFC, he could perform three "representative" jobs in the national economy.  (AR 20-21.)  Thus, the ALJ found Plaintiff not disabled.  (AR 21.)

**V.    DISCUSSION[2]**

A.    <u>The ALJ Did Not Properly Consider the Medical Evidence in Determining Plaintiff's RFC</u>

Plaintiff contends that the ALJ erred in assessing the medical evidence.  (J. Stip. at 4-9.)  He argues that the ALJ relied too heavily on the findings of consulting orthopedist Vicente Bernabe, and those findings were "not consistent with or supported by the totality of evidence."  (<u>Id.</u> at 5.)  He further argues that the ALJ improperly failed to consider evidence from Dr. Khalid Ahmed, who treated him for several years, and Dr. Michael Tomkins, who examined him twice in the months leading up to the hearing.  (<u>Id.</u> at 6-8.)  As discussed below, remand is warranted based on the ALJ's failure to discuss evidence from Dr. Ahmed.

1.    <u>Applicable law</u>

A claimant's RFC is "the most [he] can still do" despite the impairments and related symptoms that "may cause physical and mental limitations that affect what [he] can do in a work setting."  § 416.945(a)(1).  A district court must uphold an

---

[2]    In <u>Lucia v. SEC</u>, 138 S. Ct. 2044, 2055 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent <u>Lucia</u> applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings.  (<u>See</u> AR 8, 32-63; J. Stip. at 4-9, 19-22); <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council).

ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision. <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005). The ALJ must consider all the medical opinions "together with the rest of the relevant evidence." § 416.927(b);[3] <u>see also</u> § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither. <u>Lester</u>, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. <u>Id.</u>; <u>see</u> § 416.927(c)(1).

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.

_____

[3] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. <u>See</u> <u>Lowry v. Astrue</u>, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); <u>Spencer v. Colvin</u>, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to 20 C.F.R. § 416.927 are to the version in effect from August 24, 2012, to March 26, 2017.

<u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996). But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may reject a treating physician's opinion whether or not that opinion is contradicted. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989) ("For example, the ALJ need not accept a treating physician's opinion which is 'brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion.'" (citation omitted) (alteration in original)). When a treating physician's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason. <u>Id.</u>; see <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (citing <u>Lester</u>, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only a "specific and legitimate reason[]" for discounting it. <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31).

An ALJ may not disregard a treating physician's opinion unless she sets forth "specific, legitimate reasons for doing so that are based on substantial evidence in the record." <u>Smolen</u>, 80 F.3d at 1285 (citation omitted). "[A]n ALJ errs when [she] rejects a medical opinion" by "doing nothing more than ignoring it." <u>Garrison v. Colvin</u>, 759 F.3d 995, 1012–13 (9th Cir. 2014) (citing <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1464 (9th Cir. 1996)).

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is

susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

### 2. Relevant background

#### i. *Medical examinations and treatment*

Plaintiff began seeing orthopedist Khalid Ahmed in January 2009 in connection with a workers'-compensation claim.[4] (AR 293.) He complained of "[r]ight elbow pain" and "[r]ight hand pain with radiating pain going up the right elbow to the right forearm to the right shoulder," resulting from "continuous trauma" from approximately August 8, 2007, to November 5, 2008, caused by his job duties as a maintenance man. (Id.) Dr. Ahmed observed that Plaintiff had "decreased lordosis" of the cervical spine, with a slightly reduced range of motion on his left side, and "evidence of tightness and spasm" at the right and left "trapezius, sternocleicomastoid, and strap muscles." (AR 296.) He noted a decreased range of motion in Plaintiff's right shoulder, "with step-off noted over right AC joints," "[e]xostosis and pain on pressure," "atrophy of right deltoid and

---

[4]    Plaintiff injured his right elbow on the job on August 8, 2007, while using a pickaxe but returned to his normal duties a few days later. (AR 294, 378.) He claims that the condition of his right arm worsened until he reinjured it on November 5, 2008, while "shoveling and pulling a backhoe." (AR 378.) He was fired, apparently sometime in December 2008, following theft allegations. (AR 38-39, 201.)

At Plaintiff's first visit with Dr. Ahmed, he reported that he had been seen at San Bernardino Hospital in November 2008 for injuries to his right shoulder and arm and was given pain medication and cortisone shots. (AR 294; see also AR 371-72.) The record does not contain any examination notes or reports from before January 9, 2009, however.

rotator cuff muscles," and a positive impingement test. (AR
297.) His wrists and hands had normal extension and flexion, but
his right wrist showed positive Tinel's and Phalen's signs.[5] (AR
298.) His thoracic and lumbar spines were assessed as normal.
(AR 298-99.) Dr. Ahmed diagnosed him with "Chronic Pain Syndrome
Secondary to Lateral Epicondylitis, Right Elbow with Failed
Cortisone Injections x1," and "Right Shoulder Tendinitis
Impingement Syndrome with AC Joint Arthritis." (AR 302.) He
placed him on temporary total disability for six weeks and noted
that Plaintiff's injuries would restrict him to lifting no more
than 10 to 15 pounds with his right arm, no forceful pulling or
squeezing with his right "upper extremity," and no overhead work
with his right arm. (AR 302-03.) Dr. Ahmed prescribed Anaprox,[6]

---

    [5] Tinel's sign is positive when tapping the front of the
wrist produces tingling of the hand. See Carpal Tunnel Syndrome,
Medicine Net, https://www.medicinenet.com/carpal_tunnel_syndrome/
article.htm (last visited Sept. 25, 2018). Phalen's sign is
positive when bending the wrist downward produces tingling of the
hand. See id. Both are considered markers of carpal-tunnel
syndrome. See id.

    [6] Anaprox is a brand name for naproxen sodium and is a
nonsteroidal anti-inflammatory drug used to treat pain and
swelling. See Anaprox, WebMD, https://www.webmd.com/drugs/2/
drug-10989/anaprox-oral/details (last visited Sept. 25, 2018).

Prilosec,[7] Norco,[8] baclofen,[9] Paxil,[10] and Tranxene[11] and recommended physiotherapy and an MRI. (AR 303.)

At a follow-up visit with Dr. Ahmed on February 20, 2009, Plaintiff still complained of pain in his right elbow and shoulder as well as numbness in those areas. (AR 290.) Dr. Ahmed noted that the numbness "very well may be coming from the cervical spine" and recommended further diagnostic studies and physiotherapy. (AR 290.)

Plaintiff continued to see Dr. Ahmed regularly for right-elbow and shoulder pain and was also diagnosed with disc protrusion of the cervical spine with radiculitis. (See, e.g.,

---

[7] Prilosec is a brand name for omeprazole and is used to treat stomach and esophagus problems, such as acid reflux, ulcers, heartburn, and difficulty swallowing. See Prilosec, WebMD, https://www.webmd.com/drugs/2/drug-7957-1173/ prilosec-oral/omeprazole-delayed-release-suspension-oral/details (last visited Sept. 26, 2018).

[8] Norco is a brand-name combination of the opioid pain reliever hydrocodone and the nonopioid pain reliever acetaminophen, and it works in the brain to change how the body feels and responds to pain. See Norco, WebMD, https:// www.webmd.com/drugs/2/drug-63/norco-oral/details (last visited Sept. 26, 2018).

[9] Baclofen is a muscle relaxant used to treat muscle spasms caused by multiple sclerosis or spinal-cord injury or disease. See Baclofen, WebMD, https://www.webmd.com/drugs/ 2/drug-8615/baclofen-oral/details (last visited Sept. 26, 2018).

[10] Paxil is a brand name for paroxetine and is a selective serotonin reuptake inhibitor used to treat anxiety and depression. See Paxil, WebMD, https://www.webmd.com/drugs/2/ drug-6968-9095/paxil-oral/paroxetine-oral/details (last visited Sept. 26, 2018).

[11] Tranxene is a brand name for clorazepate dipotassium, a benzodiazepine used to treat anxiety, acute alcohol withdrawal, and seizures. See Tranxene, WebMD, https://www.webmd.com/drugs/ 2/drug-14016/tranxene-t-tab-oral/details (last visited Sept. 26, 2018).

AR 260-64, 265-69, 273-77.)  In June 2009 Dr. Ahmed recommended and Plaintiff agreed to right lateral epicondylar release surgery because treatment with pain medication, cortisone injections, and physical therapy had not been effective.  (AR 274.)  Plaintiff had surgery in July 2009.  (AR 373.)

On September 25, 2009, Plaintiff again saw Dr. Ahmed, who observed that he had "mildly decreased" abduction, forward flexion, and internal rotation in his right shoulder and discomfort in his left arm.  (AR 266.)  He diagnosed "compensatory pain, [l]eft [e]lbow," and recommended pain medication and physical therapy for both elbows.  (_Id._)  At a follow-up visit on November 17, 2009, Dr. Ahmed observed "pain on extension" of Plaintiff's lumbar spine, a positive straight-leg-raise test,[12] a positive axial-loaded compression test[13] of Plaintiff's cervical spine, and "diminished and painful" mobility.  (AR 261.)

Plaintiff's condition evidently did not improve, and he continued seeing Dr. Ahmed regularly.  On April 29, 2010, Plaintiff had an MRI of his cervical spine, which showed posterior disc protrusions at the C3-C4 and C5-C6 levels but no

---

[12]  A straight-leg-raise test checks the mechanical movement of neurological tissues and their sensitivity to stress and compression when disc herniation is suspected.  See Straight Leg Raise Test, Physiopedia,https://www.physio-pedia.com/ Straight_Leg_Raise_Test (last visited Sept. 26, 2018).  Pain when the leg is raised to between 30 and 70 degrees "is suggestive of lumbar disc herniation."  _Id._

[13]  An axial-compression test checks for shoulder or spinal pain when pressure is placed on the patient's head; one version of it is known as "Spurling's Test."  See Spurling's Test, Physiopedia, https://www.physio-pedia.com/Spurling%27s_Test (last visited Sept. 26, 2018).

12

evidence of spinal stenosis. (AR 475-76.) On May 26, 2010, Plaintiff underwent a neurological examination and electrodiagnostic study by Dr. Mumtaz A. Ali, after a referral from Dr. Ahmed. (AR 465-72.) Dr. Ali observed that Plaintiff's "[s]ensation to fine touch and pinprick was decreased in the right 4th and 5th digits" (AR 468), and lab tests showed decreased motor-conduction velocity in his right ulnar motor nerve and decreased amplitude in his right ulnar sensory nerve but no evidence of cervical radiculopathy or denervation (AR 471). He concluded that "[Plaintiff's] subjective complaints are consistent with the history of injury." (AR 469.)

On July 23, 2010, in response to Dr. Ali's report and Plaintiff's continuing complaints of pain, Dr. Ahmed requested an authorization for surgery. (AR 459-63.) The record does not disclose what type of surgery was contemplated. (See id.) Dr. Ahmed made another authorization request on September 10, 2010, recommending "cubital tunnel release of the right elbow." (AR 453-54, 457.) Plaintiff underwent that surgery on October 30, 2010. (AR 443.) He continued to see Dr. Ahmed regularly thereafter for pain in both of his arms and his neck. (See, e.g., AR 419-29.)

On May 2, 2011, agreed medical examiner Dr. David Wood[14] apparently examined Plaintiff in connection with his workers'-compensation claim and found him to have "loss of sensation from the ulnar nerve arising from the right elbow," with "ongoing

_____

[14] Dr. Wood appears to have been an orthopedist, although the AR does not expressly state as much. (See, e.g., AR 335 (Plaintiff seen for "orthopedic" reexam; report typed on stationery from University Spine & Orthotics).)

13

related pain" and "loss of muscle power." (AR 332-33.)[15] Dr.
Wood observed that Plaintiff had difficulty with daily activities
like "opening car doors, getting in and out of a car, and taking
a bath." (AR 333.) He gave Plaintiff an eight percent upper-
extremity impairment and a five percent whole-person impairment[16]
based on the carpal-tunnel syndrome and a two percent upper-
extremity impairment and one percent whole-person impairment
based on his "cervical spine condition." (Id.) He also
evidently opined that Plaintiff "is not a candidate for surgery
to [his] cervical spine nor do I think that he needs to have any
type of surgery to the right wrist, shoulder, or left wrist" on

[15] Dr. Wood's original examination notes from May 2, 2011, are not part of the AR.

[16] "Whole Person Impairment" is a term of art in workers' compensation that refers to "[p]ercentages that estimate the impact on the individual's overall ability to perform activities of daily living, excluding work." Milpitas Unified Sch. Dist. v. Workers' Comp. Appeals Bd., 187 Cal. App. 4th 808, 814 n.5 (Ct. App. 2010) (as modified) (alteration in original) (citing Am. Med. Ass'n, Guides to the Evaluation of Permanent Impairment at 603 (5th ed. 2000)). A WPI of less than 100 percent "entitles the injured worker to a prescribed number of weeks of indemnity payments in accordance with that percentage" to compensate for the loss of "some or all of [his] future earning capacity." Id. at 819 (citation omitted).

Findings of disability for purposes of workers' compensation or other programs or agencies are not binding in Social Security cases, see Lee v. Comm'r of Soc. Sec., No. 2:16-cv-02565-CKD, 2018 WL 684799, at *5-6 (E.D. Cal. Feb. 1, 2018) (citation omitted) (WPI of 19 percent based on injury to plaintiff's right "upper extremity" not entitled to particular weight in application for SSI and DIB; affirming Commissioner's finding that plaintiff was not disabled), but may be considered as evidence of possible impairment, see Meza v. Colvin, No. CV 15-7291-SP, 2016 WL 7479321, at *4-7 (C.D. Cal. Dec. 29, 2016) (remanding in part because ALJ failed to consider opinion of treating psychiatrist who assessed plaintiff with nine- to 12-percent WPI and various functional limitations); see also § 416.904.

an "acute basis," but surgery "should be held open to him in the future possibly" if his condition worsened. (AR 415.) On July 1, 2011, Dr. Ahmed reported that Plaintiff was "quite frustrated" because "he was apparently waiting for surgical intervention in terms of his carpal tunnel, but he says just the first cut is funding," apparently referring to a lack of insurance coverage for left-wrist or shoulder surgery. (AR 420.)

Plaintiff was examined by Dr. Ahmed again on August 12, 2011. (AR 413-18.) Dr. Ahmed observed positive Tinel's and Phalen's signs on both hands and a positive axial-loading compression test on his cervical spine, and he noted that "[m]obility is diminished and painful." (AR 414.) Dr. Ahmed saw Plaintiff again in January and April 2012 to refill his prescriptions for Norco and Prilosec, and he also prescribed two topical treatments for pain relief. (AR 403-12.) He noted both times that Plaintiff's mobility was still diminished and painful and that he had a positive axial-compression test. (AR 404, 409.)

On March 11, 2013, Plaintiff was reexamined by Dr. Wood. (AR 335-41.) He complained of "constant, aching pain in the neck with locking when turning the head to the right," "constant, aching pain and at times popping in the right shoulder," "off and on, sore type pain in the right elbow," and "ongoing numbness into the last three fingers of the right hand." (AR 335.) He indicated that his symptoms worsened when holding or gripping things with his right hand, stretching out his right arm, turning his neck, or driving, among other things. (AR 335-36.) He also complained of pain and numbness in his left wrist that "increases

with lifting trash bags." (AR 336.) He rated his elbow pain at four of 10 and his other pains at six or seven of 10. (AR 335-36.) Dr. Wood found him to have normal ranges of motion in his cervical spine, shoulders, and wrists, but he noted reduced grip strength in his right hand and positive Tinel's and "Mill's"[17] tests on his right side. (AR 337-39.) X-rays showed "spurring off of [the] C5 and C6 [vertebrae]" and mild shoulder arthritis with acromial spurring. (AR 339.) Dr. Wood concluded that Plaintiff "d[id] not appear significantly changed" from his evaluation in 2011, when he had rated him in his workers'-compensation case as "temporarily totally disabled" for the period at issue. (AR 340; see also AR 333.)[18]

On June 28, 2013, shortly after he applied for SSI benefits, Plaintiff again visited Dr. Ahmed, complaining of neck pain. (AR 399.) Dr. Ahmed diagnosed him with "Cervical Sprain/Strain, Disk Lesion with Radiculitis/Radiculopathy with Evidence of Herniated Nucleus Pulposus with Positive MRI Scan," "Tendonitis, Impingement Syndrome, Right Shoulder with Positive MRI Scan," residual loss of strength in his right elbow resulting from surgery, and "Tendonitis, Carpal Tunnel Syndrome, Right Wrist and

[17] A Mill's test is used to diagnose lateral epicondylitis, or "tennis elbow." See Mill's Test, Physiopedia, https://www.physio-pedia.com/Mill%E2%80%99s_Test (last visited Sept. 25, 2018). The clinician holds the affected elbow with one hand and extends and flexes the patient's forearm and wrist; if the patient experiences pain, the test is positive. Id.

[18] Plaintiff was ultimately rated "permanent and stationary" at seven percent WPI for state- and local-benefits purposes. (AR 366.) The designation occurred on October 25, 2013, and took into account gastrointestinal "injury" Plaintiff incurred as a side effect of his pain medications. (Id.)

16

Hand with Positive NCV Test," among other things.  (<u>Id.</u>)  Dr. Ahmed prescribed Norco and Ultram[19] for pain and Prilosec for "gastric mucosa."  (<u>Id.</u>)  Plaintiff indicated that those medications had been helpful in the past.  (AR 400.)

On October 9, 2013, Plaintiff saw Dr. Ahmed for a follow-up visit, complaining of neck pain.  (AR 355-58.)  Dr. Ahmed found him to have tightness in the muscles surrounding his cervical spine and a cervical-spine rotational range of motion of only 65 degrees.[20]  (AR 356.)  He repeated his previous diagnoses and renewed Plaintiff's prescriptions for Norco, Ultram, and Anaprox. (<u>Id.</u>)

Five days later, on October 14, 2013, Plaintiff was examined by consulting orthopedist Bernabe.  (AR 346-51.)  The doctor reviewed "a medical progress note dated 3/11/13"[21] but evidently none of Plaintiff's other medical records.  (AR 346.)  Dr. Bernabe reported that Plaintiff had had "x-rays of the neck" showing degenerative osteoarthritis, but he was apparently unaware of Plaintiff's MRI results or the electrodiagnostic study that confirmed nerve damage to his right hand and arm.  According to his report, Plaintiff complained only of right-elbow and neck pain and "denie[d] any numbness or tingling to his right upper extremity."  (AR 347.)  Dr. Bernabe's report does not mention

[19]    Ultram is a brand name for tramadol, an opioid pain reliever.  <u>See</u> <u>Ultram</u>, WebMD, https://www.webmd.com/drugs/2/drug-11276/ultram-oral/details (last visited Sept. 26, 2018).

[20]    Dr. Wood's March 11, 2013 report lists 80 degrees bilaterally as the "normal" range of motion for rotation of the cervical spine.  (<u>See</u> AR 337.)

[21]    This presumably refers to some or all of Dr. Wood's report (AR 335-41), but Bernabe's notes do not expressly say so.

17

Plaintiff's history of carpal-tunnel syndrome in both wrists or any problem with his left hand or wrist. (See AR 346-51.)

Dr. Bernabe observed that Plaintiff had a normal range of motion in his neck, arms, wrists, and shoulders, could ambulate normally, and could get on and off the examination table without difficulty. (AR 348-49.) Plaintiff's right-hand grip strength was noticeably weaker than his left, but Dr. Bernabe assessed his motor strength as "grossly within normal limits" and opined that he had "normal" sensation in his upper extremities. (AR 349.) He further opined that Plaintiff could work with "no manipulative restrictions." (AR 350.)

On January 10, 2014, Plaintiff returned to Dr. Ahmed's office, complaining of pain in his left wrist. (AR 393-94.) Dr. Ahmed noted swelling in Plaintiff's left wrist and observed that "[e]xtension is 45 degrees, flexion is 45 degrees, radial deviation is 20 degrees, and ulnar deviation is 30 degrees." (AR 394.) He reported relevant diagnoses of "Bilateral Carpal Tunnel Syndrome" and "Chronic Pain Syndrome" secondary to epicondylitis of the right elbow, right-shoulder impingement, disc lesion of the cervical spine, complications from surgery, and compensatory pain of the left elbow. (AR 394-95.) Dr. Ahmed "agree[d]" with another doctor's assessment of seven percent WPI. (Id.)

On December 22, 2014, Plaintiff was examined by Dr. Miguel Martinez[22] at Arrowhead Regional Medical Center, complaining of chronic right-hip pain that became worse with activity. (AR 560-63.) Dr. Martinez observed "swelling" and "warmth" in

---

[22] The AR does not indicate Dr. Martinez's medical specialty.

18

Plaintiff's right hip (AR 563) and noted a positive straight-leg-raise test in his right leg at a 30-degree angle (AR 562).  He diagnosed him with "ongoing right leg radiculopathy" and chronic right-hip pain, prescribed ibuprofen and Tylenol, and ordered another MRI of Plaintiff's spine.  (AR 561-62.)

On February 3, 2015, Dr. Michael Tomkins[23] examined Plaintiff, apparently as a follow-up to the visit with Dr. Martinez.  (AR 557-59.)  Plaintiff complained of arm pain as well as "chronic neck and low back pain" that "radiates into his right leg/hip" and "is worse with lying and sitting."  (AR 557.)  He rated his pain at eight of 10.  (Id.)  Plaintiff apparently told Dr. Tomkins that "he was recommended for surgery in the past and would like to see an [o]rthopedic [s]urgeon" about his lower-back pain.  (Id.)  It is not clear whether Plaintiff was referring to Dr. Wood's 2011 recommendation that surgery be left open as a future possibility (AR 415) or if he received a more specific referral for surgery at some other time; no such referral is in the record.  Dr. Tomkins prescribed gabapentin,[24] naproxen,[25] and

---

[23] Dr. Tomkins appears to have been a family practitioner.  (See, e.g., AR 557.)

[24] Gabapentin, also sold under the brand name Neurontin, is an anticonvulsant used to relieve nerve pain.  See Gabapentin, WebMD, https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited Sept. 25, 2018).

[25] Naproxyn, also sold under the brand name Naprosyn, is a nonsteroidal anti-inflammatory that relieves pain from muscle aches and reduces pain, swelling, and joint stiffness caused by arthritis.  See Naprosyn Tablet, WebMD, https://www.webmd.com/drugs/2/drug-1705-1289/naprosyn-oral/ naproxen-oral/details (last visited Sept. 26, 2018).

diclofenac gel,[26] referred him to an orthopedist, and made a note
to check on the status of the planned MRI.  (AR 559.)

On April 29, 2015, Plaintiff was seen for the second time by
Dr. Tomkins, who noted tenderness in the left neck paravertebral
musculature of Plaintiff's cervical spine and in the right
paravertebral musculature of Plaintiff's lumbar spine.  (AR 551.)
He observed a positive straight-leg raise on the right side and
decreased range of motion in Plaintiff's left cervical-spine
rotation.  (Id.)  He renewed the prescriptions for naproxen and
gabapentin.  (AR 552.)

On April 30, 2015, Plaintiff underwent an MRI of his lumbar
spine, which showed diffuse disc bulges at the L3-4 and L4-5
levels with facet hypertrophy, causing mild spinal and foraminal
stenosis.[27]  (AR 536.)  Plaintiff returned on May 29, 2015, to
discuss his MRI results with Dr. Tomkins (AR 548) and on July 14,
2015, to receive intramuscular injections of Toradol[28] and its

_____

[26] Diclofenac is a nonsteroidal anti-inflammatory drug that
reduces substances in the body that cause pain and inflammation.
See Diclofenac, Drugs.com, https://www.drugs.com/diclofenac.html
(last updated Mar. 23, 2017).  It is used to treat mild to
moderate pain or signs and symptoms of osteoarthritis and
rheumatoid arthritis.  Id.

[27] Spinal stenosis is a narrowing of the spinal canal and
can cause pain, numbness, tingling, and difficulty standing or
walking.  See What is Spinal Stenosis?, WebMD, https://
www.webmd.com/back-pain/guide/spinal-stenosis#1 (last visited
Sept. 25, 2018).  Foraminal stenosis is a narrowing of the
openings allowing nerves to branch from the spine to the rest of
the body and can cause similar symptoms.  See Foraminal Stenosis,
Cedars-Sinai Med. Ctr., https://www.cedars-sinai.edu/Patients/
Health-Conditions/Foraminal-Stenosis.aspx (last visited Sept. 25,
2018).

[28] Toradol is a brand name for ketorolac, an NSAID pain
reliever.  See Toradol, WebMD, https://www.webmd.com/drugs/2/
drug-57955/toradol-intramuscular/details (last visited Sept. 25,

generic equivalent from an unnamed provider (AR 546-47).

On May 29, 2015, evidently at the appointment to discuss
Plaintiff's MRI results (AR 548-49), Dr. Tomkins completed a
"Physical Impairment Questionnaire" supplied by Plaintiff's
counsel. (AR 541-44.) After noting that he had had only two
visits with Plaintiff, he diagnosed him with "cervical spine disk
bulge" and "lumbar spine disk bulge" causing "neck pain with
radicular [symptoms]" and "lumbar spine pain w[ith] [r]ight leg
pain." (AR 542.) He indicated that Plaintiff's condition was
"not likely to improve, unless [he] undergoes surgery or other
treatments." (Id.) He also indicated that Plaintiff's symptoms
were "often," although not "frequently," "severe enough to
interfere with the attention [and] concentration required to
perform simple work-related tasks." (Id.)

Dr. Tomkins filled out the next section of the form with
"direct answers from [Plaintiff]," including limitations on
walking, sitting, standing, and working an eight-hour day without
unscheduled breaks; he opined, "based on [Plaintiff's] response,"
that Plaintiff was not "physically capable of working" a normal
40-hour weekly work schedule. (AR 543.)

Dr. Tomkins also indicated that Plaintiff could "never" lift
50 pounds, "occasionally" lift 20 pounds, and "frequently" lift
10 pounds or less. (Id.) He noted that Plaintiff had
"limitations in doing repetitive reaching, handling, or
fingering" but that he was "unable to assess" what percentage of
an eight-hour workday Plaintiff would be able to use his hands,

2018).

fingers, or arms for specific activities.  (Id.)  He estimated,

"based on [his] experience with [Plaintiff] and based upon

objective medical, clinical, and laboratory findings," that

Plaintiff would be absent from work as a result of his conditions

three or four times a month.  (Id.)  He also indicated that

Plaintiff was not a malingerer, "at least w[ith] [his] limited

encounters."  (Id.)  He concluded by noting that he did not know

how long Plaintiff had had the assessed limitations and then

wrote, "1 year?"  (AR 544.)

                    ii.  *Reviewing opinions and evaluations*

     On October 31, 2013, SSA medical consultant Dr. Leonard

Naiman[29] reviewed Plaintiff's medical files, including the

records from Dr. Ahmed, Dr. Wood, and Dr. Bernabe, which he

considered as "significant objective findings" (AR 77), in order

to assess Plaintiff's RFC (AR 74-84).  He placed "great weight"

on Dr. Bernabe's report and "adjudicated [Plaintiff's

application] strongly on" it.  (AR 79, 81.)  He found that

Plaintiff could lift 50 pounds "occasionally" and 25 pounds

"frequently," stand or walk for about six hours of an eight-hour

workday, and "[f]requently" or "[o]ccasionally" climb, balance,

stoop, kneel, crouch, or crawl.  (AR 79-80.)  He assessed

manipulative limitations on left and right overhead reaching and

bilateral handling and feeling, and he recommended that Plaintiff

avoid "concentrated exposure" to cold, vibration, and hazards.

(AR 80-81.)  Those findings supported an RFC for medium work with

---

     [29]  The AR does not indicate Dr. Naiman's medical
specialty, but he appears to have been an internist.  See Schmidt
v. Colvin, No. EDCV 13-1331-JPR, 2014 WL 4237124, at *4 & n.8
(C.D. Cal. Aug. 26, 2014).

some limitations and a finding that Plaintiff was not disabled. (AR 83.)  Although Dr. Naiman reported relying heavily on Dr. Bernabe's examination notes, he put in manipulative limitations, such as those for bilateral fingering and reaching, that were not in Dr. Bernabe's report; he did not cite any medical document or opinion in particular on which he based those limitations.  He found Plaintiff's allegations "credible" and opined that his impairments "as documented are not inconsistent with symptoms and functional limitations as alleged" but nevertheless did not "preclude RFC as written."  (AR 82.)

On April 11, 2014, SSA medical consultant Dr. George Walker, a general practitioner,[30] conducted an RFC assessment based on Plaintiff's allegations of "worsening of his shoulder and neck pain along with a new impairment of not being able to sleep because of the pain."  (AR 90, 94.)  Dr. Walker found the allegations "not credible" because they were "not supported by new functional or objective" medical reports.  (AR 91.)  He upheld Dr. Naiman's RFC assessment and the finding of "not disabled."  (AR 92-96.)

     3.  <u>Analysis</u>

The ALJ gave "great weight" to the opinions of nonexamining physicians Naiman and Walker and "significant weight" to that of consulting examiner Bernabe.  (AR 18.)  She afforded "less weight" and "little weight" to treating physician Tomkins's May

---

[30]  Dr. Walker's electronic signature includes a medical-specialty code of 12, indicating "Family or General Practice." (See AR 94); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

29, 2015 assessment. (AR 18-19.) The ALJ did not discuss Dr. Ahmed or any of his treatment notes, examination results, or opinions on Plaintiff's condition and limitations. (AR 12-21.)

Dr. Ahmed had a five-year treatment relationship with Plaintiff in connection with his workers'-compensation claim that included at least three visits in the seven months after Plaintiff's application date. (See AR 260-307, 308-22, 355-59, 393-488.) After his initial visit with Plaintiff, in January 2009, the doctor opined that he could lift no more than 10 to 15 pounds with his right arm and could not do forceful pulling, squeezing, or overhead lifting on his right side. (AR 302-03.) He apparently never revised that assessment.[31] (See AR 260-307, 308-22, 355-59, 393-488.) The ALJ therefore erred in failing to provide a specific and legitimate reason for rejecting his opinion (or, for that matter, any reason at all). See Smolen, 80 F.3d at 1285; (cf. AR 12-21). For the reasons stated below, the error was not harmless.

Defendant argues that Dr. Ahmed's opinion was properly rejected because he gave it more than four years before the application date and "indicated that [Plaintiff's] limitations

_____

[31] On February 12, 2010, Dr. Ahmed reported that Plaintiff would "soon be reaching maximum medical improvement" and would "return [to work] in the next seven weeks." (AR 484.) But on what appears to have been Plaintiff's next visit, on March 26, 2010, Dr. Ahmed noted a positive Spurling test on Plaintiff's cervical spine and impaired mobility in his right shoulder. (AR 479.) He did not release him to return to work but instead administered two cortisone injections, recommended another MRI and an EMG of his right shoulder, and indicated that he would reevaluate him in six to seven weeks. (AR 479-80.) He continued to treat Plaintiff for nearly another four years and did not clear him to return to work or indicate that he could do some work with less-restrictive limitations.

were only temporary pending treatment, which [he] subsequently had." (See J. Stip. at 17-18.)  Ordinarily Defendant would be correct.  See Fair v. Bowen, 885 F.2d 597, 600 (9th Cir. 1989) (doctor's opinion predating period at issue not relevant absent allegation that condition had since worsened).  But as noted above, Dr. Ahmed apparently did not revise his assessment after Plaintiff's two surgeries and several years of physiotherapy and pain medication, and his notes from Plaintiff's visits after the application date provide no reason to think that Plaintiff's condition had improved enough to warrant less-restrictive limitations.  (See AR 355-59 (progress report from Oct. 9, 2013, noting continued neck pain and diagnosing bilateral carpal-tunnel syndrome, disc lesion of cervical spine, and right-elbow and shoulder problems), 393-402 (progress reports from June 28, 2013, and January 10, 2014, noting chronic pain and continued problems with wrists, right shoulder and elbow, and cervical spine).) Nor, evidently, did he ever release Plaintiff to return to work. (See generally AR 260-322, 355-59, 393-488.)  And the ALJ never considered or discussed Dr. Ahmed's opinion issued after the application date that Plaintiff had permanent seven-percent WPI and would require "lifetime medical treatment."  (See AR 394-95); Meza v. Colvin, No. CV 15-7291-SP, 2016 WL 7479321, at *4-7 (C.D. Cal. Dec. 29, 2016) (ALJ erred in failing to provide any reason for rejecting treating psychiatrist's opinion that plaintiff had mental-health limitations that caused nine- to 12-percent WPI).

Defendant's argument that Dr. Bernabe's opinion is "more probative of Plaintiff's condition during the relevant time period" because Dr. Bernabe examined Plaintiff in October 2013

ignores Plaintiff's three visits with Dr. Ahmed in the seven
months after he applied for SSI benefits, two of which were
before Dr. Bernabe's exam and one of which was after.
Defendant's analogous argument about the opinions of nonexamining
physicians Walker and Naiman fails for the same reason.[32]

Defendant also argues that Dr. Ahmed's opinion could
reasonably have been rejected because he "was a worker's
compensation doctor and thus was looking at whether Plaintiff
could return to his past work." (See J. Stip. at 17 (citing AR
293-305).) Although a "treating physician's opinion" is not
necessarily conclusive as to "the ultimate issue of disability,"
see Magallanes, 881 F.2d at 751, it is well settled that an ALJ
must properly consider every medical opinion without regard to
its source or purpose. See Macri v. Chater, 93 F.3d 540, 543-44
(9th Cir. 1996) (ALJ entitled to draw inferences logically
flowing from evidence adduced in connection with workers'-
compensation proceeding although state disability determination
not conclusive); Booth v. Barnhart, 181 F. Supp. 2d 1099, 1105
(C.D. Cal. 2002) ("[T]he ALJ may not disregard a physician's

_____

[32] Defendant further claims that the opinions of Drs.
Walker and Naiman are "more probative" because those doctors
"reviewed the medical record, including several reports which
came after Dr. Ahmed's opinion." (J. Stip. at 18.) But several
of those subsequent reports were from Dr. Ahmed himself (see AR
74-77 (Naiman noting review of two sets of medical records
received from Dr. Ahmed in 2013 and specifically mentioning Dr.
Ahmed's Nov. 2012 progress notes), 87-90 (Walker noting review of
three sets of records received from Dr. Ahmed between Aug. 2013
and Feb. 2014 and specifically referring to Dr. Ahmed's Feb. 2013
progress notes), 308-22, 355-59, 393-488 (sets of medical records
from Dr. Ahmed submitted to SSA and dating from 2010 to 2014)),
and, as stated above, further developments in Plaintiff's
condition do not appear to have led him to revise his initial
assessment (see AR 260-307, 308-22, 355-59, 393-488).

opinion simply because it was initially elicited in a state workers' compensation proceeding."); § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").

Here, the ALJ explicitly credited the opinion of Dr. Wood — the agreed medical examiner in Plaintiff's worker's-compensation case whose latest examination of Plaintiff occurred three months before the application date — and used it in determining his RFC. (AR 17-18.) Further, she cited Dr. Ahmed's treatment notes from Plaintiff's November 7, 2012 visit as objective evidence of his carpal-tunnel syndrome. (AR 17 (citing AR 314-15, 319).)[33] She also expressly rejected the February 3, 2015 County disability determination (AR 493) as "an opinion on an issue reserved to the Commissioner" that had "no probative value," "was not supported by objective evidence," and was "inconsistent with the record as a whole, including [Plaintiff's] activities of daily living" (AR 19), but did she not make any similar statement about Dr. Ahmed's opinion or progress notes. Thus, there is no basis to infer that Dr. Ahmed's status as a worker's-compensation doctor was the reason the ALJ not only implicitly rejected his assessment but failed to acknowledge its existence at all. (See AR 12-20.)

Accordingly, on the record before the Court, it is not clear that the ALJ gave proper consideration to the opinion of Dr. Ahmed, Plaintiff's longest-standing treating physician. Had the ALJ properly considered that opinion, she might have determined Plaintiff's RFC — and thus his disability status — differently.

---

[33] The ALJ's citation to AR 319 appears to have been erroneous. That page is part of Dr. Ahmed's progress notes from a July 25, 2012 visit that is not mentioned or discussed in the ALJ's decision. (Compare AR 17 with AR 319.)

Her failure to provide any explanation at all, much less a specific and legitimate one, for rejecting Dr. Ahmed's assessment was therefore not harmless.  See Garrison, 759 F.3d at 1012–13; see also Allen v. Comm'r Soc. Sec. Admin., No. 2:16-cv-00304-SAB, 2017 WL 5140877, at *6-7 (E.D. Wash. Sept. 19, 2017) (ALJ committed reversible error in discounting opinion of Plaintiff's treating physician in favor of consulting examiner's opinion in case alleging carpal-tunnel syndrome and degenerative spinal disease).

Because the Court reverses on this ground, it declines to address Plaintiff's contentions as to the weight afforded Dr. Tomkins's opinion; the ALJ will necessarily have to reevaluate it in light of her assessment of Dr. Ahmed's opinion and treatment notes.  Moreover, as the ALJ assessed Plaintiff's credibility in part based on her erroneous evaluation of the "objective medical evidence" (see AR 17), any reevaluation of the latter will necessarily entail a reassessment of Plaintiff's subjective symptom testimony.  Thus, the Court need not reach the issue of Plaintiff's credibility, either.  See Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand.").

B.   Remand for Further Proceedings Is Appropriate

When an ALJ errs, as here, the Court "ordinarily must remand for further proceedings." Leon v. Berryhill, 880 F.3d 1041, 1044-45 (9th Cir. 2017) (as amended Jan. 25, 2018); see also Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended); Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).

The Court has discretion to do so or to directly award benefits under the "credit-as-true" rule. Leon, 880 F.3d at 1045. "[A] direct award of benefits was intended as a rare and prophylactic exception to the ordinary remand rule[.]" Id. The "decision of whether to remand for further proceedings turns upon the likely utility of such proceedings," Harman, 211 F.3d at 1179, and "[w]here . . . an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency," Leon, 880 F.3d at 1045 (second alteration in original) (citing Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1105 (9th Cir. 2014)).

Here, further administrative proceedings would serve the useful purpose of allowing the ALJ to give proper consideration to all of the medical evidence in the record. See Pino v. Colvin, No. CV 14-5524-E, 2015 WL 12661949, at *5 (C.D. Cal. Mar. 24, 2015) (remand appropriate when parties disputed extent and implications of plaintiff's degenerative disc condition and it was "not clear that the ALJ would be required to find Plaintiff disabled" for entire claimed period "if the rejected medical opinions were fully credited"). If the ALJ chooses to discount evidence from Plaintiff's treating physicians in favor of opinions from consulting physicians or to discount Plaintiff's subjective symptoms, she can then provide an adequate discussion of the evidence justifying her doing so. See Payan v. Colvin, 672 F. App'x 732, 733 (9th Cir. 2016). Therefore, remand for further proceedings is appropriate. See Garrison, 759 F.3d at 1020 & n.26.

## VI.  CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[34] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this memorandum decision.


DATED: September 27, 2018

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[34]  That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."